KEALEY PHARMACY & HOME CARE SERVICE, INC.; Milton Avenue Pharmacy; Rademacher Drugs, Inc. d/b/a East Troy Drugs; Lake Mills Pharmacy, Inc.; Joseph Jameson d/b/a Monticello Pharmacy, a partnership; James S. Krisik d/b/a Genoa City Pharmacy; Phil Lutgen d/b/a Delafield Pharmacy Walgreen Agency; Kunkel Pharmacy, Inc.; Gollash Pharmacies, Inc. d/b/a Bernie's Walgreen Agency Langmack's, Inc. d/b/a Langmack's Drugs; D & W Pharmacies, Inc. d/b/a Monona Drive Walgreen Agency; and Busse Pharmacy, Inc., Plaintiffs,

v.

WALGREEN COMPANY, Defendant.

COLLINS DRUGS, INC., a Wisconsin corporation, Plaintiff,

v.

WALGREEN CO., an Illinois corporation, Defendant.

Nos. 80–C–522, 80–C–523.

United States District Court, W. D. Wisconsin.

June 3, 1982.

Dennis L. Hansch, Janesville, Wis., for plaintiffs in No. 80–C–522.

Douglas L. Flygt, Madison, Wis., for plaintiff in No. 80–C–523.

H. Dale Peterson, Madison, Wis., for defendant in both cases.

## OPINION AND ORDER

CRABB, Chief Judge.

These civil actions for injunctive and monetary relief under the Wisconsin Fair Dealership Law, Wis.Stats. § 135.01 *et seq.*, are before the court on defendant's motions for summary judgment. Both actions were begun in state court and removed here by defendant. Diversity jurisdiction is present. 28 U.S.C. § 1332. The issue in both cases is whether the Wisconsin Fair Dealership Law permits a grantor to cancel *all* of its dealership arrangements within the state for bona fide economic reasons such as a change in its manner of doing business. For the reasons that follow, I conclude that the Wisconsin Fair Dealership Law does not permit grantors to terminate dealerships *for any reason other than "good cause,"* as that term is defined in the Act; that defendant Walgreen's termination of

its dealership agreements was without good cause; and that those plaintiff-dealers whose agreements are covered under the Act are entitled to damages and to partial summary judgment in their favor, but that none of the plaintiffs is entitled to injunctive relief.[1]

From the record, I find that there is no genuine issue with respect to the following material facts.

## FACTS

Plaintiffs are pharmacies doing business in the State of Wisconsin. Defendant is a corporation organized under the laws of the State of Illinois, with its principal place of business at 200 Wilmot Road, Deerfield, Illinois.

Defendant manufactures and sells under its own private labels a wide variety of drugs, beauty aids, and household commodities. It also sells similar products manufactured by other companies. Prior to October 1, 1980, defendant sold these products to the consuming public through a nation-wide system of both company-owned and independently-owned stores.

Every independently-owned drug store which sold Walgreen brand products operated under a standard written agreement (the "Retailer's Agreement"). At the beginning of 1980, approximately 1,400 independently-owned drug stores operated throughout the United States under such agreements.

The Retailer's Agreement governed all aspects of the contractual relationship between defendant and its dealers including such matters as the right of the independently-owned store to use the Walgreen trade name and trademark, defendant's right to locate a company-owned store near the independently-owned store, and the minimum amount of Walgreen products that the retailer must purchase each year.

---

1. In its amended complaint, plaintiff Collins Drugs, Inc. requests as relief: damages resulting from defendant's termination of his dealership, an injunction enjoining defendant, its subsidiaries, or affiliates from establishing, owning or operating any drug store within a ten-mile

radius of plaintiff for the next five years, and an order directing defendant to repurchase all inventories. The remaining plaintiffs seek permanent injunctive relief against the termination of their dealerships and damages incurred as a result of defendant's conduct.

Paragraph "Fourth. (c)" of the Retailer's Agreement expressly provided that "[i]n the event Walgreen determines at any time to discontinue all similar Agreements, it may, at its option, terminate this agreement upon thirty days' written notice" to the dealer. Under the terms of the Retailer's Agreement, the plaintiff dealers were permitted to, and did, purchase additional goods for resale from suppliers other than defendant.

On April 14, 1980, defendant's board of directors met and decided to discontinue the operations of its Agency Division, which administered the defendant's relationship with its dealers, and to terminate all of the Retailer's Agreements as of October 1, 1980, on the ground that these independently-owned drug stores were producing an inadequate rate of return.

By letter dated April 17, 1980, defendant informed plaintiffs and each of its other approximately 1,400 independent dealers that, pursuant to paragraph "Fourth. (c)" of its Retailer's Agreement, defendant had elected to terminate the agreements, effective October 1, 1980.

By letter dated April 28, 1980, defendant informed every dealer that defendant would furnish the dealer's name and address to manufacturers, wholesalers, suppliers, and vendors for the purpose of assisting the dealers in finding alternative sources of supply. Subsequently, defendant gave to other drug store companies the names and addresses of most of its dealers.

As a result of defendant's April, 1980 decision to terminate the Agency Division and all of its Retailer's Agreements, the division was disbanded. Division staff was reduced from 110 persons to 3; over half of the staff left defendant's employment and the remainder were transferred to other positions within the Walgreen organization. The division field personnel responsible for the dealers in the State of Wisconsin are no longer employed by defendant.

As of October 1, 1980, defendant had Retailer's Agreements with the various plaintiffs executed on these dates: 1) Bernie's Walgreen Agency, March 21, 1972; 2) Genoa City Pharmacy, April 4, 1973; 3) Delafield Pharmacy, June 4, 1974; 4) Kealey Pharmacy, August 21, 1974; 5) Milton Avenue Pharmacy, August 21, 1974; 6) Collins Drugs, October 9, 1975; 7) Langmack's Drugs, June 7, 1976; 8) East Troy Drugs, June 23, 1976; 9) Lake Mills Pharmacy, November 11, 1976; 10) Monticello Pharmacy, June 7, 1977; 11) Busse Pharmacy, August 15, 1978; 12) Kunkel Pharmacy, September 26, 1978; 13) Monona Drive Walgreen Agency, approximately January 1, 1979; and 14) Willis Drugs, February 5, 1979.

Plaintiffs Kealey Pharmacy, Langmack's Drugs, Busse Pharmacy, and Kunkel Pharmacy had had previous agreements with defendant predating the enactment of the Wisconsin Fair Dealership Law in April, 1974. The earlier agreements contained no provisions for renewal, but were for fixed periods of time, subject to earlier termination upon the occurrence of certain specified conditions. The more recent agreements were entitled "Retailer's Agreements," as were the earlier ones; they contain no reference to any earlier agreement between the parties; and, in fact, they bear no indication of being renewals of previous agreements. The Kealey and Langmack agreements with defendant differ from their earlier agreements with defendant in several respects: some trade names are added while others are deleted; for example, paragraph 2(c) and the last sentence of paragraph 2(a) of the old agreements are deleted from the new agreements. For plaintiff Kealey Pharmacy, the minimum yearly purchase requirement was increased from $7,500 to $20,000. For plaintiff Langmack's Drugs, Inc., the minimum purchase requirement was increased from $12,000 to $25,000.

Defendant continues to operate company-owned stores in Wisconsin.

## OPINION

A. *Dealership Agreements Covered by the Wisconsin Fair Dealership Law*

Defendant does not contend that plaintiffs are not dealers within the meaning of

that term in Wis.Stats. § 135.02. It contends, however, that not all of the plaintiffs are parties to agreements subject to the provision of the Wisconsin Fair Dealership Law, either because they were operating under agreements executed prior to the effective date of the law or because they were operating under "renewal agreements" executed prior to the effective date of the amendment to the Fair Dealership Law which specified that the provisions of the law extended to renewal agreements. Therefore, the threshold inquiry is to determine which of the plaintiffs are parties to agreements subject to the provisions of the Wisconsin Fair Dealership Law.

The fourteen plaintiffs of this consolidated lawsuit may be considered in four categories: (1) those that at the time of termination were operating under a Retailer's Agreement executed prior to April 5, 1974 (the effective date of the Wisconsin Fair Dealership Law); (2) those that were operating under Retailer's Agreements executed after April 5, 1974, but before November 24, 1977 (the effective date of the amendments to the Wisconsin Fair Dealership Law), having been parties to previous Retailer's Agreements executed prior to April 5, 1974; (3) those that were operating under Retailer's Agreements executed after November 24, 1977, having been parties to previous Retailer's Agreements executed before April 5, 1974; and (4) those that were operating under Retailer's Agreements executed after April 4, 1974, having not been parties to previous agreements with defendant.

### 1. Pre-April 5, 1974 agreements

■ As the Wisconsin Fair Dealership Law was originally enacted in 1974, it provided that

> No grantor, directly or through any officer, agent or employe may terminate, cancel, fail to renew or substantially change the competitive circumstances of a Retailer's agreement *entered into after*

the effective date of this act (1973) [sic] without good cause.[2] The burden of proving good cause shall be on the grantor.

Wis.Stats. § 135.03. (Emphasis supplied.) It is clear from the language of the statute as it was originally enacted, that pre-April 5, 1974 agreements were not entitled to coverage under the Wisconsin Fair Dealership Law. However, by an amendment enacted in November 24, 1977, the underscored language was deleted, and Wis.Stats. § 135.025 was created to provide that one of the purposes of the Wisconsin Fair Dealership Law was "to govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States." Wis.Stats. § 135.025(2)(d). By its deletion of the underscored phrase, the legislature seemed to be inviting the courts to grant coverage under the Wisconsin Fair Dealership Law to those grantees of dealership entered into prior to April 5, 1974.

In *Wipperfurth v. U-Haul Co. of Western Wisconsin, Inc.*, 101 Wis.2d 586, 304 N.W.2d 767 (1981), the Supreme Court for the State of Wisconsin declined the legislature's invitation. In *Wipperfurth*, the parties had entered into a written agreement of indefinite duration on September 17, 1969. The dealer, Wipperfurth, argued that the Fair Dealership Law should be applied retroactively to provide him with the protections of the Act. Wipperfurth contended that such retroactive application was a reasonable exercise of the state's police power. The court rejected this argument, holding that retroactive application of the Wisconsin Fair Dealership Law would be an unconstitutional impairment of the obligation of contract in violation of the contract clause contained in Article I, § 10 of the United States Constitution, because the legislature had failed to make the showing that retroactive application of the Act to existing contracts was reasonably necessary and exigent, and served a vital purpose of government.

---

**2.** The Wisconsin Fair Dealership Law became effective the day after it was published. It was published April 4, 1974.

In the instant case, two of the plaintiffs' complaints are controlled by *Wipperfurth.* Plaintiff Genoa City Pharmacy entered into its agreement with defendant on April 4, 1973 and plaintiff Bernie's Walgreen Agency entered into its agreement with defendant on March 21, 1972. Therefore, with respect to these plaintiffs, defendant's motion for summary judgment will be granted and their amended complaints will be dismissed.

2. *Agreements executed after April 5, 1974, but renewed prior to November 24, 1977 by plaintiffs that had been parties to previous agreements with defendant executed prior to April 5, 1974*

■ Plaintiffs Kealey Pharmacy and Langmack's Drugs executed dealership agreements with defendant on August 21, 1974, and on June 7, 1976, respectively. Defendant contends that these agreements are outside the scope of the Fair Dealership Law because the agreements were renewals of earlier agreements, executed before the enactment of the 1977 amendment which made explicit provision for the coverage of renewal agreements.

When it enacted the Fair Dealership Law in 1974, the legislature intended it to apply to all dealership agreements "entered into thereafter." As *Wipperfurth* makes clear, the mere continuance after April 5, 1974 of a dealership arrangement of indefinite duration does not constitute a dealership agreement "entered into after" that date. *Wipperfurth v. U-Haul Co. of Western Wisconsin, Inc.,* 101 Wis.2d 586, 304 N.W.2d 767. Similarly, an automatic renewal contemplated under the terms of a dealership agreement is not an agreement "entered into" so as to bring the dealership under the original terms of the Act.

The new Kealey and Langmack contracts were not simply automatic renewals of the prior contracts; they represented a significant alteration of the relationship between the parties. The new contracts differed from the prior ones in several respects and, in particular, with respect to the minimum yearly purchase requirement for each dealer. Moreover, under the old contracts, defendant had no obligation to renew its agreement with either plaintiff.

Thus, when defendant negotiated the new contracts, it was making a fresh decision in each instance whether to appoint Kealey Pharmacy and Langmack's Drugs as Walgreen agencies. *Cf. Reinders Bros. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 49–50 (7th Cir. 1980) (where grantor and dealer operated under annual contracts providing no guarantee of a new contract for the succeeding year, it was apparent that the parties saw themselves as making a new dealership agreement each year, so as to bring their dealership under the terms of the Fair Dealership Law as of their first annual agreement following enactment of the law).

In the circumstances present in this case, I find and conclude that the Kealey and Langmack contracts were dealership agreements "entered into" after April 5, 1974, and therefore subject to the terms of the Fair Dealership Law.

There is no issue of retroactive application of the law to these agreements. As of April 5, 1974, neither defendant nor plaintiff Kealey (nor plaintiff Langmack) had incurred any of the contractual obligations they have under the agreements at issue here. *Edwards v. Kearzey,* 96 U.S. 595, 601, 24 L.Ed. 793 (1877); *Chippewa Valley Securities Co. v. Herbst,* 227 Wis. 422, 278 N.W. 872 (1938); *see also Wipperfurth,* 101 Wis.2d at 603, 304 N.W.2d 767.

3. *Agreements executed after November 24, 1977 by plaintiffs that had been parties to previous agreements with defendant predating April 5, 1974*

■ Plaintiffs Kunkel Pharmacy and Busse Pharmacy ground their claims for relief on dealership agreements entered into on September 26, 1978 and August 15, 1978. Both of these plaintiffs had been parties to previous dealership contracts with defendant. Because the new agreements were executed after the 1977 amendment had been enacted, they are covered by the law, whether they are viewed as new agree-

ments or as renewal agreements. *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d at 51.

### 4. *Agreements executed after April 5, 1974 but before November 24, 1977*

The remaining eight plaintiffs entered into dealership agreements after the effective date of the Wisconsin Fair Dealership Law.[3] Defendant does not dispute their claims to the protection of the Wisconsin Fair Dealership Law as it existed at the date of the contract.

### B. *Scope and Constitutionality of the Wisconsin Fair Dealership Law*

Defendant musters two arguments against binding it to the provisions of law: the first is that the legislature never intended to make the Fair Dealership Law applicable to statewide terminations of dealerships effected for legitimate business reasons, and the second is that if the legislature did intend such a broad application of the law, it was acting unconstitutionally in violation of defendant's rights to due process and to freedom of contract.

I turn first to the issue of the interpretation of the statute to determine whether a Wisconsin court hearing these diversity cases would hold that the Wisconsin Fair Dealership Law was intended to apply to statewide terminations of dealerships, undertaken for legitimate business reasons.

### 1. *Applicability of Wisconsin Fair Dealership Law to Statewide Dealership Terminations*

Section 135.03 of the Wisconsin Fair Dealership Law proscribes the termination, cancellation, failure to renew, or substantial change in the competitive circumstances of a dealership agreement "without good cause."[4] "Good cause" is defined in § 135.-02 as:

> (a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or
>
> (b) Bad faith by the dealer in carrying out the terms of the dealership.

The statute says nothing about any circumstances in which a grantor may terminate an agreement for any reason other than the dealer's bad faith or failure to perform its obligations under the agreement. The fair inference is that any other terminations are violative of the statute. In this respect, the statute is clear and unequivocal. Ordinarily, when the language of a statute is unambiguous, judicial inquiry is at an end, *United States v. Agrillo-Ladlad*, 675 F.2d 905 (7th Cir. 1982). Defendant counters, correctly, that the rules of statutory construction do not bind a court to a literal reading of a statute, where literalism would lead to a result wholly at odds with the legislature's intent, *see, e.g., Church of the Holy Trinity v. United States*, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892); *Spaulding v. Chicago & Northwestern Railway Co.*, 30 Wis. 110 (1872);[5]

---

**3.** The eight are Delafield Pharmacy, Milton Avenue Pharmacy, Collins Drug, East Troy Drugs, Lake Mills Pharmacy, Monticello Pharmacy, Monona Drive Walgreen Agency, and Willis Drug.

**4.** As amended in 1977, Wis.Stats. § 135.03 reads:

> No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

**5.** In *Holy Trinity*, the Supreme Court was construing a federal statute which made criminal any act of assisting the importation into the United States of all alien workers, except those in certain specific occupations enumerated in the statute. The appellant-defendant was an American church that had contracted with a British resident to come to the United States to serve as the rector of the church. In finding the statute not applicable to the church's conduct, the Court held that the obvious construction of the statute could not be the correct construction.

> It is a case where there was presented a definite evil, in view of which the legislature

or where a clearly expressed legislative intention compels a construction contrary to the language of the statute itself. *Consumer Product Safety Comm'n v. GTE Sylvania*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). However, a heavy burden of persuasion rests on the party urging that a statute should be read to mean something other than what it appears to mean on its face. Two arguments may be marshalled in support of defendant's position that, despite the clear language dictating coverage, the statute should be declared inapplicable to the terminations at issue here. The first is what I will call the "fair treatment" argument; the second, I will refer to as the "omission of non-judicial remedies" argument.

### a. *Fair Treatment Argument*

■ Relying on the statutory statement that the Wisconsin Fair Dealership Law has as one of its purposes, "the continuation of dealerships on a *fair* basis," defendant suggests that the legislature's concern was directed solely at the discriminatory termination of one dealership or of a small number of dealerships without statutory good cause, and not about the nondiscriminatory, evenhanded, and impartial terminations at issue here. Defendant argues that the statutory references to fairness are evidence that the legislature never considered or addressed the possibility of wholesale dealership terminations and never intended to prohibit such terminations. This argument fails upon a reading of the statute, a review of the legislative history, and the application of logic.

First, nothing in the language of the statute compels the interpretation defendant suggests.[6] It is true that "fair" can mean evenhanded and impartial; it can also mean "just" and "equitable." The American Heritage Dictionary of the English Language, p. 471 (1970). Given the legislature's expressed concern with the imbalance of power between dealers and grantors, it seems unlikely that the framers of the statute intended "fair" to refer only to evenhanded, nondiscriminatory treatment as between one dealer and another, and not to refer as well to the fairness, or equitableness, of the relationship between a grantor and its dealer. It seems even more unlikely that the legislature intended to permit a grantor to take any kind of action adverse to its dealers, provided only that it took the same action with respect to all of its dealers.

Second, the legislative history of the Fair Dealership Law refutes defendant's suggestion that the legislature might not have been thinking of the possibility of statewide dealership terminations when it enacted the law. In 1973, the entire United States began to feel the effects of the concerted actions of the Organization of Petroleum

---

used general terms with the purpose of reaching all phases of that evil, and thereafter, unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against. It is the duty of the court, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute.
*Church of the Holy Trinity v. United States*, 143 U.S. 457, 472, 12 S.Ct. 511, 516–517, 36 L.Ed. 226 (1892).
In *Spaulding*, the issue was whether a statute prohibiting the bringing of an action for negligence against any person "in whose house, chamber, stable, barn, or other building, or *on whose estate* any fire shall accidentally begin," is applicable to cases of fires caused by trains passing along the railway company's track over the lands of other persons. The Supreme Court of the State of Wisconsin held the statute inapplicable on the ground that railway engines "were not within the contemplation of the framers of the statute." *Spaulding v. The Chicago and Northwestern Railway Co.*, 30 Wis. 110, 120 (1872).

6. The statute's references to fairness are contained in subsections (2)(a) and (2)(b) of § 135.025, which lists the purposes of the Fair Dealership Law as the promotion of "the compelling interest of the public in *fair* business relations between dealers and grantors, and in the continuation of dealerships on a *fair* basis," § 135.025(2)(a); and the protection of "dealers against *unfair* treatment by grantors who inherently have superior economic power and superior bargaining power in the negotiation of dealership." Wis.Stats. § 135.025(2)(b).

Exporting Countries. Many American oil companies began reducing the number of their retail gasoline outlets in Wisconsin and, in some instances, ceased supplying gasoline altogether to their independently-operated dealerships in Wisconsin. The Wisconsin legislature was aware of this phenomenon. Indeed, one proposed version of the Fair Dealership Law, Senate Substitute Amendment 3, would have limited its scope to gasoline dealership terminations only.

Moreover, in the course of enacting the Act, the Wisconsin legislature considered, but failed to adopt, Senate Amendment 4 to 1973 Assembly Bill 837. Had it adopted the amendment, the legislature would have provided exceptions from the Fair Dealership Law for actions taken by grantors to

(a) vertically integrate;

(b) alter or adjust its marketing technique, scheme or plan;

(c) withdraw from a geographic marketing area; or

(d) dispose of, through sale or lease, any parcel of real estate occupied by a dealer upon the expiration of the dealer's lease for the parcel as long as the parcel of real estate ceases to be the site of a branded outlet of the grantor.

Although the legislature's failure to enact this amendment is not dispositive of the question of its intent, it is supportive of the view that the statute should not be read in the restrictive manner urged by defendant.

Finally, logic alone would compel the conclusion that the legislature did not intend to provide an exception from the Fair Dealership Law for large scale terminations of dealerships, any more than it intended to permit exceptions for the termination of a single dealership for a bona fide business reason. As several commentators have pointed out, the adverse impact upon a dealer of a unilateral termination of its dealership is not lessened because the grantor is acting in good faith for sound business reasons.[7] Neither is the adverse impact lessened because all other similarly-situated dealers are being terminated as well.

b.  *The Absence of Non-Judicial Remedies Argument*

■ Under the Fair Dealership Law, *all* terminations, cancellations, or failures to renew dealership agreements are violative of the statute unless they are effected for "good cause." Any dealer whose dealership is terminated in violation of the statute has one remedy only: a suit for damages or injunctive relief or both. The statute makes no provision for negotiated terminations under any circumstances and it makes no provision for protecting dealers from the loss of their investment upon termination other than by legal action.[8]

---

7.  *See, e.g.*, Gellhorn, *Limitations on Contract Termination Rights—Franchise Cancellations*, 1967 Duke L.J. 465, 504–505:

Analytically, the terminating party's motives are unrelated to the harshness of the bargain or of its effect. Motives have no relationship to the parties' relative bargaining power. Nor would the application of a good faith test be affected either by whether the dominant party was misusing its power or by whether termination would have unduly harsh effects on the terminated party. Rather, its application would be determined by the extent to which such misuse was disclosed by improper motives. The assumption, in other words, seems to be that fairness can be assured (or fundamental unfairness prevented) by attention to the motives upon which a party acts. Not only is empirical support for this assumption lacking, but it also seems contrary to common sense. There is no evidence that a weaker party would be protected adequate-

ly by requiring the dominant party to exhibit proper motives in exercising the power to terminate.

*See also* Note, 74 Colum.L.Rev. 1487, 1493 (1974):

Although the franchisor may not be acting in bad faith in asserting its interest, its far superior bargaining position enables it to set these terms unilaterally, leaving the franchisee with the Hobson's choice of acquiescence or loss of its investment. If the legislative determination that franchisees need special protection is to be effectuated, franchisees should be protected from their own agreements even where the franchisor is acting with complete good faith.

8.  By contrast, the federal Petroleum Marketing Practices Act permits a dealer and grantor to terminate a dealership by agreement under certain situations and permits the grantor to withdraw from a particular geographic market area,

The absence of any non-judicial remedy for termination or of any provision under which a dealer can effect a valid termination of a dealership it no longer wants to continue suggests two possibilities. The first is that urged by defendant: the absence of these provisions demonstrates that the legislature was addressing only the discriminatory termination of individual dealerships, effected under circumstances in which the grantor remains a viable franchisor within the state, continuing to operate through independent dealerships. Surely, the argument continues, the legislature neither desired nor intended to lock every grantor into eternal dealership agreements with each of its Wisconsin dealers, despite the grantor's desire to withdraw from an entire geographic area, or to cease production of the kinds of products sold through the dealerships, or to change its entire system of marketing its products. Thus, the legislature must have intended an exception for such major changes in the grantor's method of doing business.

The flaw in this interpretation is that it is no more reasonable to assume that the legislature intended to prohibit forever the closing down of *one* of a grantor's dealerships than to assume that the legislature intended to prohibit forever the closing down of *all* of the grantor's dealerships. The defendant's interpretation ignores the fact that, just as there are instances in which a grantor has sound business reasons for closing all of its dealerships, there are instances in which a grantor has equally sound business reasons (but not the "good cause" required under the statute) for ending its relationship with a particular dealer.

The second and more plausible interpretation of the Fair Dealership Law's omission of non-judicial remedies is that the legislature was not trying to create a system of "perpetual care" dealerships, but rather that it believed that only the threat of a civil action for money damages or injunc-

tive relief would give sufficient support to a dealer's bargaining position to allow the dealer to negotiate a fair termination agreement.

The legislature may well have concluded that when a grantor terminates a dealership for any reason other than good cause, the dealer should be reimbursed for any loss of investment caused by the termination. Having reached this conclusion, it may have decided that, rather than try to fashion a procedure that would permit terminations subject to some statutory damage formula, it would leave the task of determining a dealer's fair compensation to the courts to be determined on a case-by-case basis. Creating a cause of action for damages based on all terminations except those motivated by good cause was the most expeditious way to draft a statute which would achieve this legislative objective.

The legislature's concern was to protect dealers. It is consistent with this concern that the legislature would have provided that in any termination not undertaken for good cause, the dealer is entitled to a judicial determination of the damages it has incurred as a result of its termination and, in appropriate instances, to an injunction against the termination.

At first reading, the statutory provision of injunctive relief against invalid terminations supports the view that application of the Act to statewide dealership terminations would have the effect of prohibiting any business changes from ever occurring, an effect that the legislature could not have intended. However, a closer look at the statute reveals that the grant of injunctive relief is discretionary with the court. Section 135.06 provides that a dealer "also *may* be granted injunctive relief against unlawful termination, cancellation, nonrenewal, or substantial change of competitive circumstances." Wis.Stats. § 135.06 (Emphasis supplied).[9] By making the granting of

___

subject to certain conditions. *See* 15 U.S.C. § 2802(b)(2). Under 15 U.S.C. § 2805(c), a franchisor can "buy out" uneconomical franchises. *See, generally, Brach v. Amoco Oil Co.,* 677 F.2d 1213 (7th Cir. 1982).

**9.** In full, Wis.Stats. § 135.06, *Action for damages and injunctive relief,* reads as follows:

injunctive relief discretionary, the legislature gave implicit recognition to the fact that there would be instances of dealership terminations where permanent injunctive relief would be wholly inappropriate.

█ For the foregoing reasons, I conclude that a Wisconsin court considering this issue would hold that the Wisconsin Fair Dealership Law is not limited in its application to only those terminations or other adverse actions that discriminate against one dealer in relation to other dealers; rather, a Wisconsin court would conclude that the law was intended to, and does, cover nondiscriminatory, across-the-board terminations of dealerships even if those terminations are undertaken because the grantor decides to withdraw from an entire geographic area, or to cease production of the products sold by its dealers, or to change its marketing structure, or for any other business reason.

2. *Constitutionality of the Wisconsin Fair Dealership Law as Applied to Across-the-Board Dealership Terminations*

█ The remaining question is whether the application of the Fair Dealership Law to company-wide dealership terminations is constitutional or whether it violates defendant's rights to freedom of contract and to due process.

Defendant has not elaborated on its contention that application of the Wisconsin Fair Dealership Law to its Retailer's Agreements impairs its freedom of contract. Its contention might be based upon the argument that application of the Act would modify the parties' obligations under their Retailer's Agreements beyond what the parties could be held to have anticipated; in other words, that a retroactive application of the Act would be unconstitutional.

However, the provisions of the Act apply only to those agreements or renewals of agreements entered into after April 5, 1974,

the effective date of the Act. Once the Act took effect, defendant can be held to have had notice of its provisions and to have contracted accordingly. Compare *Wipperfurth*, 101 Wis.2d 528, 304 N.W.2d 767, where the court held that retroactive application of the Wisconsin Fair Dealership Law to dealership agreements entered into before April 6, 1974, the effective date of the Act, would impair unconstitutionally the obligation of contract, with *Kuhl Motor Co. v. Ford Motor Co.*, 270 Wis. 488, 71 N.W.2d 420 (1955), where the court held that when the challenged statute was in effect at the time the agreement was made, the issue of retroactive impairment of the obligation of contract did not arise.

Alternatively, defendant's argument may be that the Wisconsin Fair Dealership Law is an unconstitutional impairment of defendant's freedom to enter into contracts and to terminate those contracts. Such an argument would be essentially coextensive with the substantive due process argument to which I turn now.

Freedom of contract or, more accurately, the right to be free from impairment of the obligation of contracts, derives from Art. I, sec. 10, clause 1 of the United States Constitution. For analytic purposes, it can be viewed in these cases as another aspect of the liberty and property interests of individuals protected by the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

█ As a general rule, both the making of contracts and the use of property are private matters, not subject to governmental intervention. But neither property rights nor contract rights are absolute; both may be regulated by the state to "advance the safety, happiness and prosperity of [the state's] people and to provide for [the state's] general welfare." *New York v. Miln*, 11 Pet. 102, 139, 9 L.Ed. 648 (1837), quoted in *Nebbia v. New York*, 291 U.S.

If any grantor violates this chapter, a dealer may bring an action against such grantor in any court of competent jurisdiction for damages sustained by him as a consequence of the grantor's violation, together with the ac-

tual costs of the action, including reasonable attorneys fees, and the dealer may also be granted injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change of competitive circumstances.

502, 523, 54 S.Ct. 505, 509–510, 78 L.Ed. 940 (1934). Neither the Fifth nor the Fourteenth Amendment prohibits governmental regulation for public welfare. The amendments "merely condition the exertion of the admitted power by securing that the end shall be accomplished by methods consistent with due process." *Nebbia v. New York*, 291 U.S. at 525, 54 S.Ct. at 510.

■ As an exercise of Wisconsin's power to regulate private business for the public welfare, the Fair Dealership Law is attended by a presumption of constitutionality. The courts have no power to review these determinations; they are not authorized to substitute their own views for those of the legislature about what is economically wise or necessary. The popularly-elected legislature is vested with the exclusive authority to determine the need for economic regulation and the appropriate response to such needs. It has broad scope to experiment in the areas of social and economic legislature, subject to judicial restraint only when it acts arbitrarily or unreasonably, or when the means selected have no real or substantial relation to the object sought to be attained by the regulatory action. *Nebbia v. New York*, 291 U.S. at 525, 54 S.Ct. at 510–511.

As the Supreme Court noted in *Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963),

The doctrine ... that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely has long since been discarded.[10] We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. [Footnote not in original]

*See also Hodel, Acting Secretary of the Interior v. Indiana*, 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981).

■ It is not for this court to say whether the Wisconsin legislature acted wisely in choosing to penalize, and in some instances prohibit, terminations of dealerships except for specified causes. It is this court's task only to determine whether the legislative enactment is arbitrary or unreasonable or whether it lacks a real and substantial relation to the legislative concern for the general welfare.

I find no evidence of arbitrariness or unreasonableness in the Fair Dealership Law. It was reasonable for the legislature to make the determination that unilateral terminations of dealerships have an adverse effect both upon the terminated dealers and upon the public, and it was reasonable for the legislature to determine that the adverse effect was severe enough to warrant legislative subordination of the rights of contract and the free play of market forces.

It is no more violative of due process to apply the Fair Dealership Law to wholesale dealership terminations such as those resulting from a company-wide change in marketing structure than it is to apply the Act to individual terminations. The Wisconsin legislature may impose restrictions upon a grantor's termination rights and may impose liability upon a grantor who terminates for any reasons other than those permitted under the statute, without violating the grantor's rights under the United States Constitution.

Under the Fair Dealership Law, grantors remain free to enter into dealership agreements with Wisconsin dealers, subject only to certain restrictions upon their ability to modify or cancel those agreements. The restrictions are set out in the statute, they are known in advance to the grantor, and they apply equally to all grantors. The strict prohibitions upon termination are a

**10.** This doctrine was articulated in such cases as *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (invalidation of the New York state law setting maximum daily and weekly hours of work for bakers); *Adkins v. Children's Hospital*, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (invalidation of state minimum wage laws for women); *Coppage v. Kansas*, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441 (1915) (invalidation of Kansas statute making it a misdemeanor for an employer to require an employee to agree not to become or remain a member of a labor union during the term of his employment).

rational means of preventing grantors from subjecting economically-weaker dealers to severe financial hardship through termination or nonrenewal of dealership agreements; they serve to redress the imbalance of bargaining power between grantor and dealer. Application of the Act's penalties to all terminations other than those effected for statutorily-defined good cause is neither arbitrary nor unrelated to the goal of redressing the unequal bargaining power between the two parties to a dealership agreement.

Moreover, the legislature avoided the constitutional problem that would attend a statute that required a grantor to continue doing business forever with its Wisconsin dealers, whatever the economic consequences, when it committed the issuance of permanent injunctive relief to the court's discretion. As a consequence, a grantor is not prohibited entirely from terminating its dealers when it wishes to withdraw from the state, to cease production, or to change its marketing structure.

I conclude that the application of the Wisconsin Fair Dealership Law to the terminations at issue herein does not violate any constitutional right of the defendant.

■ Having found that the Wisconsin Fair Dealership Law applies to statewide terminations and such an application is not unconstitutional, I find and conclude that defendant's terminations of plaintiffs' dealerships were without good cause, in violation of Wis.Stats. § 135.03, and that defendant is liable to those dealers covered by the statute for the damages resulting from the terminations.[11]

## C. Remedy

All of the plaintiffs are seeking damages and all plaintiffs except Collins are seeking permanent injunctions forbidding defendant from terminating their dealerships.

### 1. Money damages

■ The plaintiffs have not moved for summary judgment on the issue of defendant's liability for money damages under the Fair Dealership Law. However, it is proper for a court to enter summary judgment for non-moving parties, if no factual dispute exists and if the non-movants are entitled to summary judgment as a matter of law. 6 Moore's Fed.Practice, ¶ 56.12, p. 56–334 (2d Ed. 1982).

There is no dispute of fact among the parties, only a dispute as to whether on the non-disputed facts defendant has any liability to those plaintiffs covered by the provisions of the Fair Dealership Law. On that issue, plaintiffs are entitled to partial summary judgment in their favor. Defendant is liable to all plaintiffs except Genoa City Pharmacy and Bernie's Walgreen Agency for money damages resulting from the terminations of plaintiffs' dealerships effected in violation of Chapter 135, the Wisconsin Fair Dealership Law. The appropriate damages remain to be determined in a subsequent proceeding.

### 2. Injunctive Relief

■ The basis for injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies. *Beacon Theatres v. Westover*, 359 U.S. 500, 506–507, 79 S.Ct. 948, 954–955, 3 L.Ed.2d 988 (1959); *Fox Valley Harvestore v. A.O. Smith Harvestore Prod.*, 545 F.2d 1096 (7th Cir. 1976). In addition, the court must balance the probabilities of harm to the individual parties if an injunction is or is not issued, and determine whether the public interest will be disserved by its issuance. In the cases before the court, there is no showing that the harm to plaintiffs cannot be compensated adequately by an award of damages. Moreover, I am persuaded that it would be unduly burdensome to require defendant to maintain its distribution system in Wisconsin when it has abandoned that

---

**11.** Technically, defendant has violated Wis. Stats. § 135.04 as well, by not providing plaintiffs 60 days within which to rectify deficiencies. However, because the reason for termination was not a deficiency on the part of the dealer, there would be no point in requiring defendant to redress this omission.

system in every other state. Finally, societal interests are not served by prohibiting businesses from ever changing their business structures or their methods of operation. I conclude, therefore, that a grant of permanent injunctive relief is not justified in these cases, and I will grant defendant's motion for summary judgment on plaintiffs' claims for permanent injunctive relief requiring the reinstatement of the dealerships.

Whether plaintiff Collins Drugs, Inc. is entitled to permanent injunctive relief against permitting defendant to operate a store within ten miles of the premises of Collins Drugs, is a matter which cannot be determined on the present record.

## ORDER

IT IS ORDERED that

(1) defendant's motion for summary judgment is GRANTED as to plaintiffs Genoa City Pharmacy and Bernie's Walgreen Agency, and the complaints of these plaintiffs are DISMISSED;

(2) defendant's motion for summary judgment is GRANTED with respect to plaintiffs' claims for permanent injunctive relief requiring the reinstatement of the dealership agreements;

(3) in all other respects defendant's motion for summary judgment is DENIED; and

(4) partial summary judgment on the issue of defendant's liability for damages resulting from the terminations of their Walgreen agencies is GRANTED in favor of all plaintiffs except Genoa City Pharmacy and Bernie's Walgreen Agency.