**BITRONICS SALES COMPANY, INC.,
a Minnesota corporation, Plaintiff,**

v.

**MICROSEMICONDUCTOR CORPORA-
TION, a Delaware corporation,
Defendant.**

**Civ. No. 4–82–1290.**

United States District Court,
D. Minnesota,
Fourth Division.

May 1, 1985.

---

Robert A. Brunig, O'Connor & Hannan, Minneapolis, Minn., for plaintiff.

Charles K. Dayton, Pepin, Dayton, Herman, Graham & Getts, Minneapolis, Minn., and Alan M. Klein, Los Angeles, Cal., for defendant.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiff, Bitronics Sales Company, Inc. (Bitronics), brought this action against defendant Microsemiconductor Corporation (Microsemi) alleging violations of the Sales Representative Agreement (agreement) between the parties and that the agreement constitutes a "franchise" that was terminated without good cause in violation of the Minnesota Franchise Act, *Minn.Stat.* § 80C.01 *et seq.* (the Act).

The case was tried before the court and a jury. A special verdict was returned on February 4, 1985. The jury found that the agreement provided for Bitronics to receive commissions at a rate greater than five percent, but that Bitronics had waived its right to this higher commission rate. It further found that Bitronics was entitled under the agreement to receive commissions on sales made by other manufacturer representatives and awarded it $1,000 for such commissions. The jury concluded that Bitronics was not entitled to sales made by distributors. On the issue of notice of termination, the jury found that Bitronics received such written notice on April 2, 1982 and was entitled under the agreement to a 120 day notice period. The jury then determined that Bitronics was entitled to $37,000 in commissions for the 120 day notice period. The jury also found that the parties modified their written agreement after January 13, 1975 and that Bitronics had not breached a material provision of the agreement sufficient to excuse performance by Microsemi.

Subsequent to return of the verdict, memoranda were submitted from both parties relative to post-trial motions filed by Microsemi and legal issues still in dispute. All materials were received by the court as of March 13, 1985 when the matters were formally taken under advisement.

### Jury Verdict

The parties focus their discussion on different aspects of the jury verdict. Microsemi seeks to alter or amend the judgment regarding damages under Fed.R.Civ.P. 59(e) and, alternatively, a new trial on the issue of damages only, under Fed.R.Civ.P. 59(a). It also seeks relief from judgment under Fed.R.Civ.P. 60(b)(6). Bitronics requests an addition to the amount awarded by the jury on special verdict question 6, judgment notwithstanding the verdict on the jury's finding that Bitronics waived its right to commissions at a rate in excess of five percent, and prejudgment interest on the amount of the judgment.

The court has carefully considered the points and authorities raised in the memoranda, as well as the evidence and issues at trial, and finds that a new trial is not warranted and that the judgment should be upheld. The parties requested a jury trial, and the contested issues were decided by a jury. The jury verdict is supported by the evidence.

### Damages

Microsemi argues that the separate awards of damages on special verdict questions 6 and 11 must both be reduced or, alternatively, a new trial must be held, because they are not supported by the evidence. Bitronics contends that the evidence supports an even greater award for question 6 and is sufficient to uphold the amount awarded in response to question 11. Question 6 asked for the amount of additional commissions on sales made by other manufacturer representatives to which Bitronics is entitled. The jury answered the question by awarding Bitronics $1,000. Question 11 asked what amount

Bitronics should receive for commissions earned in the time period from the giving of the notice of termination through the end of the period of notice to which it was entitled. The jury answered this question by awarding Bitronics $37,000.

■ Microsemi concedes that, under the verdict, the plaintiff is entitled to commissions on sales by Skor, Inc. for question 6. (Microsemi claims these commissions total $384.57, while Bitronics argues they properly total $388.65.) The evidence supports the inclusion of the Skor, Inc. commissions in answer to question 6. The answer is also supported by the evidence of commissions earned by Stan Clothier, Inc. in the amount of $1,600.26. Microsemi argues that Bitronics sought during closing arguments to have the jury apply these commissions to the award under question 11. Thus, it argues that upholding the $1,000 award under question 6 would grant Bitronics a double recovery on the Clothier commissions. Bitronics, on the other hand, ignores the possibility that the jury may have awarded part of the Clothier commissions under question 11 and argues that the court must include an addition of $988.91 on question 6. It was for the jury to determine whether some of those commissions should be applied to commissions earned in the notice period or to commissions from sales by other manufacturer representatives. The award for commissions from sales by other manufacturer representatives was neither against the evidence nor inadequate in light of all the evidence.

■ Microsemi claims that the award of $37,000 under question 11 is excessive for several reasons. It argues that Bitronics is entitled only to commissions on orders shipped during the termination period. Bitronics asserts that under the contract it was entitled to commissions for any orders booked prior to the end of the termination period. The language of the agreement is ambiguous, therefore, it was for the jury to determine what commissions were owing.

Microsemi also argues that the award must be reduced because it was based in part upon what it calls the "Medtronic, Inc. annual forecast of expected orders." It claims the evidence demonstrates that this was not an order, but only a forecast and, therefore, no commissions are owing from it. Bitronics, on the other hand, claims that the commissions owing from what it calls the "Medtronic, Inc. Annual Purchase Agreement" show that there is substantial evidence to sustain the verdict. The evidence on this issue consists of two letters and the testimony of Steve Nelson, purchasing manager for Medtronic, Inc.

Plaintiff's exhibit 44 is a March 3, 1982 telex from Microsemi to Medtronic, Inc., which states in relevant part:

SUB: ANNUAL PURCHASE AGREEMENT

. . . . .

TO CONFIRM THE AGREEMENT WHICH WE UNDERSTAND WILL BE EFFECTIVE FOR ALL PRICING ON ORDERS PLACED FROM 1 MARCH 1982 UNTIL 28 FEBRUARY 1983 AS FOLLOWS:

| | |
|---|---|
| 137067–002 | 6800 @ $4.75 EA. |
| 137071–007 | 8000 COMBINATION OF |
| –008 | –007, –008, R –011 |
| | at $2.30 EA. |
| 137075–002 | 100,000 @ $4.00 |

Defendant's exhibit 33 is a March 3, 1982 letter from Nelson to Mike Gregson of Microsemi which covers the same parts listed in the telex but states that it is a "Pricing Agreement" and that:

This letter is to agree on pricing and terms only and to advise you with respect to the anticipated usage for planning purposes. Buyer has no responsibility whatsoever to any materials, labor or other costs or expenses incurred by you, except if such cost or expenses are incurred in response to actual purchase orders placed with your company.

Nelson testified that the documents do not reflect an actual purchase order, but that all of the parts listed were in fact purchased, and purchased at the unit prices.

Whether or not this transaction gave rise to a commission for Bitronics under its

sales representative agreement with Microsemi depends upon an evaluation of the above evidence and an interpretation of the contractual language. The agreement provided:

> Manufacturer agrees to and shall pay Sales Representative a commission when all of the three following activities occur: (i) orders for the Products originate (specified) in the Territory; (ii) purchase of the Products is made in the Territory; and (iii) the Products are used and serviced in the Territory. Said commission shall be paid on or before the *21st* day of the month next following the month in which Manufacturer receives payment for such Products, and, except as hereinafter provided, said commission shall be a percentage of the net billing price (net of federal, state and local taxes and discounts) as follows:

It was for the jury to determine from the conflicting evidence what was required under the agreement to earn a commission and whether the March 3, 1982 transaction entitled Bitronics to a commission.

■ The jury was properly instructed that "[i]f a contract is prepared by one of the parties to the contract and if the language is ambiguous, you are to construe the language against the party who prepared the contract." The undisputed evidence was that the agreement at issue had been drafted by Microsemi. The jury's answer to question 11 reflects a reasonable finding that Bitronics was entitled, at least in part, to a commission for the Medtronics agreement and subsequent sales. The jury also received other evidence of sales on orders booked and invoiced, and orders booked but not shipped during the termination period. Bitronics argues the evidence would support a verdict of $45,-777.39. Microsemi contends the evidence only justifies $12,567.04. The jury's award of $37,000 was neither against the evidence nor inadequate in light of all the evidence.

■ Bitronics seeks judgment notwithstanding the verdict claiming that there is no evidence to support the jury's finding that Bitronics waived its right to commissions at a rate in excess of five percent. Fed.R.Civ.P. 50(b) provides that a party who has previously moved for a directed verdict may move for judgment notwithstanding the verdict. Bitronics failed to move for a directed verdict during the course of trial; accordingly, it is precluded from seeking relief under Fed.R.Civ.P. 50(b). Furthermore, the instruction given to the jury on waiver was an accurate statement of the law, and the jury's answer that a waiver occurred is supported by the evidence.[1]

There is evidence that Bitronics intentionally relinquished its right to a higher commission by statements and conduct inconsistent with an intent to enforce that right. John C. Nutt, the president and sole shareholder of Bitronics never indicated to anyone at Microsemi, prior to the institution of this litigation, that he was or would be entitled to commission at a rate of seven percent. Nutt met with officials of Microsemi and in the mid 1970s and negotiated a contract for Iowa Technical Sales at the five percent base rate. In all of these contacts with Microsemi, Bitronics had conducted business without voicing any objection to the commission it was receiving. In addition, there was evidence that it received commissions based on the five per-

---

1. Counsel for Bitronics submitted a letter to the court dated April 30, 1985 discussing the issue of waiver and citing a recent Eighth Circuit opinion. The court has considered the arguments raised in the letter and believes they do not call for a different result. No new issues are raised and the court's ruling is consistent with governing law. The jury was properly instructed on the law of waiver.

The verdict on this question is supported by substantial evidence. The evidence on the issue of waiver includes the conversations between John C. Nutt and Microsemi over the time period from October 8, 1970, when the sales representative agreement was entered into, until April 2, 1982 when Nutt was terminated. Under Minnesota law, where different inferences may be drawn, waiver must be resolved as a fact question by the jury. *Meagher v. Karli,* 251 Minn. 477, 486, 88 N.W.2d 871, 878 (1958); *see also Cohler v. Smith,* 280 Minn. 181, 158 N.W.2d 574, 579 (1968). The evidence of Bitronics' conduct over the twelve year relationship is strong evidence of an intent to waive its rights.

cent rate and the commissions it paid its own salespeople were based on a commission rate of five percent from Microsemi. The jury's finding is reasonable in light of the evidence, and the court will not interfere with it.

*Interest*

■ Bitronics also seeks prejudgment interest. The law in Minnesota is that interest is allowed on an unliquidated claim that is readily ascertainable by computation, or by reference to generally recognized objective standards of measurement, and that does not depend upon any contingency. *ICC Leasing Corp. v. Midwestern Mach. Co.*, 257 N.W.2d 551, 556 (Minn.1977); *Moosbrugger v. McGraw-Edison Co.*, 284 Minn. 143, 170 N.W.2d 72, 82 (Minn.1969). Where ambiguity in the contract terms prevents the claim from being made certain by mathematical calculations from known factors, it is not readily ascertainable, however. *See Super Hooper, Inc. v. Dietrich & Sons, Inc.*, 347 N.W.2d 152, 156 (N.D. 1984).

■ Bitronics' claim was not readily ascertainable because it was uncertain as to time, quantity, and rate. The agreement was ambiguous on whether the proper notice period was 120 days or a lesser period; whether sales by other manufacture representatives were covered; whether commissions were earned only on those orders shipped prior to the end of the termination period; and whether the commission rate was at five or seven percent. This made the claim unliquidated and also made the amount owing not readily ascertainable. Accordingly, Bitronics' demand for prejudgment interest from the "applicable date" for interest at nine percent under *Minn.Stat.* § 549.09, subd. 1(c) through February 4, 1985; and "prior to the applicable date" for interest at six percent under *Minn.Stat.* § 334.01, shall be denied.[2]

■ The court also decided in an order dated January 31, 1985 that the notice given by Microsemi was effective at the end of the notice period provided by the contract even though it attempted to terminate the agreement at an earlier date. Bitronics now seeks reconsideration of this ruling. The issue was briefed extensively prior to the court's ruling, and the court finds no basis for reversing its decision. The notice provided by Microsemi was effective for the reasons stated in the court's earlier order.

*Franchise Act*

Bitronics seeks injunctive and ancillary monetary relief under the Act, *Minn.Stat.* § 80C.01 *et seq.* and the regulations, promulgated thereunder. The evidence at trial and the post-trial memoranda present three issues to be resolved under the Act: 1) whether applying the regulation allowing termination only for good cause would be a retroactive application of the Act, and whether such retroactive application is permissible; 2) whether Bitronics paid, either directly or indirectly, a franchise fee; 3) assuming, the Act applies, whether the termination of Bitronics violated its provisions.

■ The court has carefully reviewed the record and the memoranda submitted and finds that Bitronics is not entitled to relief under the Act. The agreement predates the enactment of the pertinent regulations, and the subsequent acts of the parties are not sufficient to bring the agreement within the Act so as to avoid its impermissible retroactive application. Furthermore, the evidence supports a conclusion that Bitronics did not pay a franchise fee and therefore does not fall under the protection of the Act. Because the Act does not apply, it is thus unnecessary to determine whether its terms were violated.

---

**2.** The conclusion that Bitronics' claim for interest was not readily ascertainable is supported by Bitronics' failure to specify at any time the amount on which interest was owing and the date or dates from which it should accrue. In addition, Bitronics did not separately list interest as an item in its prayer for relief. It did not inform Microsemi that it was seeking interest until shortly before the commencement of trial.

The Act was adopted in 1973 "as remedial legislation designed to protect potential franchises within Minnesota from unfair contracts and other perceived abuses in a growing national franchise industry. Like most other franchise regulation acts, the Minnesota statute required registration by any person offering or selling a franchise within the state with the Commissioner of Securities and full disclosure in a proposed public offering statement. *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn.1978). *Minn.Stat.* § 80C.14 prohibits "any unfair or inequitable practice in contravention of such rules as the commissioner may adopt defining as to franchises the words 'unfair and inequitable'". Bitronics relies on a rule promulgated under that section which requires good cause for any franchise termination as well as 60 days written notice setting forth all the reasons for such termination. Minn.Reg.S. Div. 1714(e, f). The regulation became effective on January 13, 1975.[3]

The original sales representative agreement was executed on September 14, 1970. Bitronics argues that the "good cause" requirements can be applied retroactively to this agreement on which notice of termination was given April 2, 1982. It also argues that acts of the parties subsequent to the January 13, 1975 effective date of the regulation resulted in a new agreement or novation that falls under the Act. In February of 1975 Microsemi sent a memorandum addressed to all of its "U.S. Representatives" stating:

> The purpose of this memo is to formally reiterate a long standing Micro policy that we do not pay Rep Commissions on sales to a distributor owned or operated by a Micro Rep.
> This memo is to be considered an addendum to your Sales Representative Agreement. Please sign and return one copy.

The memorandum was signed by John C. Nutt as President of Bitronics and dated February 24, 1975. In 1977 Nutt approached Microsemi about setting up a separate entity to operate in Iowa, Nebraska, and one county in Illinois. The Iowa territory was at that time part of Bitronics' territory. In December of 1977 Microsemi and Iowa Technical Sales entered into a separate sales representation agreement covering the requested territory. The agreement was signed by John C. Nutt as Sales Representative for Iowa Technical Sales.

Applying the canons of statutory interpretation, the "good cause" requirements promulgated under *Minn.Stat.* § 80C.14 should not be given retroactive effect. Minnesota laws and rules promulgated thereunder are presumed to have no retroactive effect unless clearly and manifestly intended by the legislature. *Minn.Stat.* § 645.21; *Mason v. Farmers Ins. Cos.*, 281 N.W.2d 344, 348 (Minn.1979). The Minnesota Supreme Court found in *Mason* that no clear and manifest intent to give the good cause requirements retroactive effect existed. *Id.* The reasoning in *Mason* extends to the situation here where contractual rights vested prior to the effective date.[4] *Id.; see, e.g., Scuncio Motors, Inc. v. Subaru*, 555 F.Supp. 1121, 1131 (D.R.I. 1982).

Thus, unless one of the post-January 1975 events put forth by Bitronics is sufficient to bring the agreement within the Act, the claims must fail. Courts have found the retroactivity problem to be avoided where parties entered into negotiations for a new agreement or renewed a contract that terminated on a specific date subsequent to the effective date of the franchise act. *See Rochester v. Royal Appl. Mfg. Co.*, 569 F.Supp. 736, 739 (W.D.Wis.1983);

---

3. *Minn.Stat.* § 80C.14 was amended in 1981 to incorporate these parts of the regulation into the statute itself.

4. Application of the franchise provisions to the 1970 agreement could also result in an unconstitutional impairment of contractual rights. *See Allied Structural Steel v. Spannaus*, 438 U.S.

234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *Wipperfurth v. U–Haul Co.*, 101 Wis.2d 586, 304 N.W.2d 767, 770–73 (Wis.1981) (retroactive application of Wisconsin Fair Dealership Law prohibited as an unconstitutional impairment of contract).

*Kealey Pharmacy & Home Care Serv. v. Walgreen Co.*, 539 F.Supp. 1357, 1363 (W.D.Wis.1982); *see also Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44 (7th Cir.1980). In these circumstances the parties were making a fresh decision whether to continue the contractual relationship; thus no retroactive application was involved. *Kealey Pharmacy*, 539 F.Supp. at 1363. Minor modifications of prior contracts are not sufficient, however. There must be a significant or material alteration of the relationship between the parties for a new contract to exist which postdates the Act. *See, e.g., Kealey Pharmacy*, 539 F.Supp. at 1363; *Easterby-Thackston, Inc. v. Chrysler Corp.*, 477 F.Supp. 954, 956 (D.S.C.1979).

The 1970 Sales Representative Agreement between the parties was not an agreement that was renewed or terminated on a specified date and negotiated anew, but rather the terms provided it was to "commence on the date it is executed and continue until terminated." The only possible modifications that could bring the agreement under the Act, therefore, are the 1975 letter from Micro and the 1977 agreement between Iowa Technical Sales and Microsemi.

Neither of those events is sufficient to trigger coverage, however. The 1975 addendum was sent to every Microsemi sales representative and simply reiterated a long standing policy that it does not pay commissions under the circumstances described. This was not a significant or material alteration of the agreement. No discussion occurred between the parties, the sales agreement was not renegotiated or renewed, and in practical effect no change occurred because there is no evidence that Bitronics had ever received this type of commission.

The other modification involves the making of a sales agreement with Iowa Technical Sales. The 1977 sales agreement is between Microsemi and Iowa Technical Sales rather than Bitronics. It does not explicitly modify the sales agreement with Bitronics, although it reduces the territory covered in the 1970 agreement. Furthermore, this new Iowa Technical Sales agreement was proposed by John Nutt and entered into at his request. The parties did not make the necessary "fresh decision" about the sales agreement with Bitronics; rather the parties merely continued this pre-existing relationship, on a slightly smaller scale. Any effect on the 1970 sales agreement was not the substantial or material modification necessary to invoke the coverage of the Act. *See, e.g., Rochester v. Royal Appl. Mfg. Co.*, 569 F.Supp. 736 (W.D.Wis.1983) (relinquishment of one-half of territory insufficient to invoke Wisconsin Fair Dealership Law); *Dickinson v. Simpson Elec.*, 509 F.Supp. 1241 (E.D.Wis. 1981) (addition of a product line after effective date of Act did not amount to an amendment).

The franchise cases cited by Bitronics do not call for a different result in this case. In *Union Oil Co. v. Moesch*, 88 Cal.App.3d 75, 151 Cal.Rptr. 517 (1979), the entire lease agreement of the parties terminated after the effective date of the California franchise act. At this juncture, the parties entered into negotiations and agreed upon a new arrangement, continuing their relationship on a month-to-month basis. The lease was then finally terminated several months later. The application of the Act to these facts was not retroactive, because the parties had made the necessary fresh decision by conducting negotiations and entering into a new arrangement. *Id.* 151 Cal.Rptr. at 521. In *Phillips Petroleum Co. v. Paradee Oil Co.*, 343 A.2d 610 (Del. 1975), the parties entered into an agreement prior to the enactment of the Delaware Franchise Security Act, but subsequently renewed it on a yearly basis. Here also the parties reconsidered the entire agreement, thus making the necessary fresh decision. In effect, the parties decided to enter into a new agreement every year. The determination that the modifications to the 1970 sales agreement are insufficient to bring it within the Act is consistent with these cases cited by Bitronics. Furthermore, the Minnesota Act does not explicitly attempt to cover amendments or

renewals, in contrast to Wisconsin and Delaware where such explicit statutory language is included.[5]

██ The evidence also shows that the relationship between the parties was not a franchise because no franchise fee was paid. A relationship is not a franchise unless each of the three statutory elements has been satisfied. *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 874–75 (Minn.1978). Franchise is defined as:

... a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons:

(a) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristic;

(b) in which the franchisor and franchisee have a community of interest in the marketing of goods and services at wholesale, retail, by lease, agreement, or otherwise; and

(c) for which the franchisee pays, directly or indirectly, a franchise fee.

*Minn.Stat.* § 80C.01, subd. 4.

Bitronics argues that it paid an indirect franchise fee. A "Franchise fee" is defined as:

Subd. 9. ... any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:

(a) The purchase of goods or agreement to purchase goods at a bona fide wholesale price;

(b) The purchase of goods or agreement to purchase goods on consignment, if the proceeds remitted by the franchisee from any such sale shall reflect only the bona fide wholesale price of such goods;

(c) The repayment by the franchisee of a bona fide loan made to the franchisee from the franchisor;

(d) The purchase of goods or agreement to purchase goods at a bona fide retail price subject to a bona fide commission or compensation plan that in substance reflects only a bona fide wholesale transaction;

(e) The purchase, at their fair market value, of supplies or fixtures or agreement to so purchase supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement;

(f) The purchase or lease, at the fair market value, of real property or agreement to so purchase or lease real property necessary to enter into the business or to continue the business under the franchise agreement.

*Minn.Stat.* § 80C.01, subd. 9.

Bitronics puts forth several possible bases for its indirect franchise fee: the agreement that Microsemi would not be required to pay commissions on sales to Bitronics' Cassidy division; its payment of prices exceeding bona fide wholesale prices for products from Microsemi; the requirement imposed by Microsemi that Bitronics purchase minimum volumes; and training school fees for a Bitronics salesperson.

---

**5.** Bitronics also alleges that in late 1973 or early 1974, the parties orally agreed to modify their agreement to permit Bitronics to establish Cassidy Electronics which acted as a distributor. No evidence of such an oral modification was produced at trial nor is there any evidence that such a modification would have been after the enactment of the good cause regulation. Furthermore, such a modification might not be sufficient to create a new agreement subject to the Act.

None of this evidence constitutes an indirect fee which a "franchisee is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement." *Minn.Stat.* § 80C.01 subd. 9. Microsemi's policy of not paying commissions on sales to a distributor owned by the Microsemi representative is an ordinary business practice. Bitronics chose on its own to establish a wholly owned distributor. It was not required by Microsemi to operate a distributor, and its failure to receive a commission for sales to its own subsidiary is merely an ordinary business expense. *See, e.g., Schultz v. Onan Corp.,* 737 F.2d 339 (8th Cir.1984); *Siedare Assoc., Inc. v. Amerex Sales Corp.,* Civ. 4–79–398 (July 20, 1981) (Alsop, J.). Furthermore, there is no evidence of any correlation between Bitronics agreeing not to receive such a commission and its having the right to enter in or continue its relationship with Microsemi.

Bitronics' allegations of minimum inventory and payments above bona fide wholesale prices are insufficient to meet the requirements of a franchise fee. There is no evidence that Bitronics agreed to such conditions, if they existed at all, for the right to enter into a business or to continue a business under a franchise agreement.[6] In fact, the volume and price requirements alleged do not even pertain to Bitronics, or the 1970 sales agreement, but rather to its wholly owned distributor. There is no claim that Bitronics was required to have a distributor; it had been established at the initiative of Bitronics. Regardless of the burden of proof, Bitronics has failed to establish that it agreed or was required to meet such conditions to enter or continue its business with Microsemi.

Finally, any expenses Bitronics might have incurred in training salesmen are in-

sufficient to create a franchise fee. "The expenditure of funds for travel, lodging, food and other ordinary business expenses does not constitute a franchise fee." *Schultz v. Onan Corp.,* 737 F.2d 339 (8th Cir.1984) (citation omitted).

### ORDER

Accordingly, based on the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that

1. Judgment be entered on the special verdict returned by the jury on February 4, 1985.

2. Based upon that verdict, plaintiff Bitronics is entitled to entry of judgment in its favor against defendant Microsemiconductor Corporation in the amount of $38,000 and its costs.

3. The motion of defendant Microsemiconductor Corporation to, alter or amend the verdict regarding damages, for a new trial on the issue of damages only, and for relief from judgment is denied.

4. The requests of plaintiff Bitronics for additional damages, judgment notwithstanding the verdict, and prejudgment are denied.

5. Plaintiff Bitronics is not entitled to relief under count four of its complaint asserting violations of the Minnesota Franchise Act, and that claim is dismissed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**6.** The evidence on volume and pricing was conflicting. John Nutt testified that Bitronics was required to make purchases of certain amounts of diodes that it would not have purchased otherwise. The deposition testimony of Michael Gregson was that only small sales were made to Cassidy while he was with Microsemi and that they were probably priced on an OEM type basis rather than at a franchise distributor's level because the distributor is buying in considerably larger volume. No documented evidence was produced to show that a minimum amount was required or to establish the price at which the sales were made. The testimony at trial was that the diodes cost only a few cents apiece.