Hillsborough-northern judicial district
No. 95-868

### W. RAY WALKER

v.

### DONALD W. AND FRANCES M. PERCY

October 1, 1997

*Daniel A. Laufer*, of Bedford, by brief and orally, for the plaintiff.

*Gallagher, Callahan & Gartrell, P.A.*, of Concord (*Donald E. Gartrell* on the brief and orally), for the defendants.

PER CURIAM. The plaintiff, W. Ray Walker, appeals an order of the Superior Court (*Barry*, J.) holding that the promissory notes on which the plaintiff brought suit had been modified to reduce the total debt owed, and that the plaintiff failed to prove intentional misrepresentation. We affirm in part, reverse in part, vacate in part, and remand.

The defendants, Donald W. and Frances M. Percy, own and operate Lubricants International (LI), a business that deals in lubricants and other products relating to the operation and maintenance of diesel engines. In 1991, the defendants met with the plaintiff, who at that time was the town administrator for Derry, with regard to a threatened tax sale of their business real estate. After helping the defendants resolve the tax matter, the plaintiff expressed an interest in their business, and the parties discussed working together to restructure LI's management and improve its cash and capital position. The parties executed an agreement on August 7, 1991, that stipulated that the plaintiff would prepare a business plan and that the parties would form a corporation to take over LI's business. The agreement also provided that Donald Percy would be the controlling shareholder and the plaintiff would have a major management position in the new corporation.

In the course of this joint venture, the plaintiff twice injected cash into the project: first, he provided $25,000 for the purchase of oil for

the defendants to sell; and second, he loaned the defendants $35,000 to settle an outstanding judgment against LI. On February 11, 1993, the parties consolidated these amounts, together with accrued interest, into a single debt evidenced by a promissory note in the amount of $65,000 (1993 note). The note became due on March 31, 1993, unless extended or assumed by TEK-5, Inc. (TEK-5), the new corporation formed to take over LI's business. The defendants gave a security agreement of even date to secure the 1993 note.

Also on February 11, 1993, the parties executed a new "Memorandum of Agreement" with respect to the joint venture. The agreement provided, *inter alia*, that in consideration of the defendants' exclusive license to TEK-5 of their patented and proprietary products, TEK-5 would assume certain of the defendants' debts, including the 1993 note and a $240,000 debt to Fleet Bank (Fleet note). The agreement also contemplated restructuring the debt of LI and authorized the plaintiff to negotiate with LI's creditors to that end. The defendants had previously signed an authorization for the plaintiff to discuss with Fleet Bank all matters regarding the Fleet note, "including buyout and/or restructuring of the note . . . [as] part of the contemplated total restructuring of [LI]."

The plaintiff negotiated with Fleet Bank regarding the Fleet note and purchased the note himself for $60,000, taking, in addition, an assignment of all instruments securing the note. The plaintiff notified the defendants of his actions in a letter dated July 2, 1993 (July 2 letter), which stated in part:

> I am pleased to let you know that I have successfully negotiated and purchased your debt (Note, Mortgages, and collateral paper) [from] Fleet Bank. All these papers have been assigned to me, so, all payments must be made to me until such time as the proper legal arrangements can be made to assign these to TEK-5. Since I had to personally borrow the money to buy out Fleet Bank and pay the legal costs I will need the following monthly payments to pay this debt.

> | | |
> |---|---|
> | Mortgage Payment: | $1,249.31 (see attached mortgage schedule) |
> | Legal Fees/Expenses: | $350.69 (twelve payments) |
> | Total: | $1,600.00 . . . July through June then the mortgage payment. |

> This is the minimum payment that I require. In addition you should pay the Town of Derry $500.00 per month until the taxes are paid.
>
> The settlement with Fleet Bank means that I purchased your debt with Fleet.

Appended to the letter was a schedule amortizing a "[m]ortgage am[oun]t" of $125,000 over 15 years at an interest rate of 8.75%. The amount of $125,000 was apparently calculated by adding the $65,000 previously owed the plaintiff to the $60,000 used to purchase the Fleet note. The defendants have consistently made the payments called for in the appended schedule.

TEK-5, however, never achieved its intended goal. By March 16, 1994, the plaintiff was voicing concerns to the defendants' counsel that defendant Donald Percy was holding up the project by dwelling on old issues and putting off investors by insisting on control. On January 6, 1995, the plaintiff gave the defendants an ultimatum to either "establish a letter of intent leading to an agreement to get TEK-5 rolling NOW or pay [the plaintiff] off." If the defendants did neither, the plaintiff would consider their debt to him to be in default. The plaintiff then brought this suit to collect the $65,000 due on the 1993 note and the $240,000 due on the Fleet note, plus accrued interest and costs of collection.

During discovery, the plaintiff apparently first learned that Donald Percy had been angered by the July 2 letter. Donald Percy testified at his deposition that when he received the letter, he concluded that he did not want to engage in any business deal with the plaintiff other than to pay off the note. Based on this information, the plaintiff amended his writ to include a count of fraud, alleging that after July 2, 1993, the defendants continued to induce the plaintiff to invest time and money into the TEK-5 project even though they knew that Donald Percy would never consummate a deal with the plaintiff.

Following a bench trial, the superior court held that the defendants were indebted to the plaintiff, but only in the amount of $125,000, since the July 2 letter modified the parties' agreement. The court also rejected the plaintiff's claims that the defendants were in default on their obligations to him for failing to pay back real estate taxes on the business property, for permitting additional tax liens to be placed on the property, and for failing to help the plaintiff secure a lien on a patent. The court found that the July 2 letter did not make the failure to pay back taxes an event of default, that the February 1993 security agreement did not secure the

defendants' real property, and that the plaintiff was able to obtain a lien on the patent without the defendants' assistance. The court also found no evidence in the July 2 letter that the defendants would be liable for fees and costs in the event of default. Finally, the court found that the plaintiff failed to prove intentional misrepresentation. The plaintiff appeals these rulings.

The plaintiff asserts that we must reverse the trial court's ruling because no reasonable person could find that there had been a meeting of the parties' minds as to the modification. Whether a contract "has been modified is a question of fact for the trial court to determine, and we will not disturb its ruling unless the record contains insufficient evidence to support it." *Maville v. Peerless Ins. Co.*, 141 N.H. 317, 320, 686 A.2d 1165, 1167 (1996) (quotation omitted). In order to hold that the contract was modified, the trial court must have found "an express or implied mutual agreement between the parties" to that effect. *Guaraldi v. Trans-Lease Group*, 136 N.H. 457, 460, 617 A.2d 648, 650 (1992).

> It is a fundamental principle of contract law that one party to a contract cannot alter its terms without the assent of the other party; the minds of the parties must meet as to the proposed modification. While such an agreement may be inferred from the conduct of the parties, it is not sufficient to show an ambiguous course of dealing from which one party might reasonably infer that the original contract was still in force, and the other that it had been changed.

*Id.* at 460-61, 617 A.2d at 650 (citations omitted).

We hold that the terms of the July 2 letter and the parties' course of conduct was at best ambiguous and that the record contains insufficient evidence to support the trial court's ruling. While the July 2 letter and attached amortization schedule recite a mortgage amount of $125,000, obtained by adding the principal amount of the 1993 note and the cost of acquiring the Fleet note, we find that when the plaintiff stated in the letter that he required specified monthly payments "to pay this debt," he was referring not to the defendants' total debt to him, but to the debt he had incurred to acquire the Fleet note. The specification of the monthly payment was clearly preceded by the explanation that "[s]ince [the plaintiff] had to personally borrow the money to buy out Fleet Bank and pay the legal costs [he] will need the following monthly payments to pay off this debt." The plaintiff also testified at trial that the payment schedule was based on the monthly payments he had to make on his outstanding debts, not on the debts the defendants owed to him.

In addition, the plaintiff testified that he viewed his purchase of the Fleet note as an intermediate step toward the ultimate goal of getting TEK-5 up and running. It was contemplated that TEK-5 would assume the defendants' debts to the plaintiff and that the plaintiff would then convert the debt to equity. The plaintiff testified that the reduced payment schedule set forth in the July 2 letter was consistent with this intent because by lowering the defendants' monthly payments, it improved the company's financial picture. Thus, the plaintiff's testimony indicates that he intended the reduced payment schedule to be a temporary accommodation to the defendants in the interest of getting TEK-5 going, and that he could have believed the terms of the original Fleet note remained in effect. He testified, for instance, that if he had known on July 2, 1993, that Donald Percy would never complete a deal with him, he would have immediately started to collect the full amount of the Fleet note.

Mr. Percy's testimony, moreover, does not clearly evince even his own subjective belief that the principal had been reduced, much less a meeting of the minds on the matter. On the one hand, Mr. Percy stated that at the time he received the July 2 letter, he did not understand the total amount of the debt to be $125,000, but on the other hand, he said that he had no reason to believe he owed more than $60,000 on the Fleet note. Mr. Percy also testified that he and his wife never expressed a belief to the plaintiff, prior to November 1994, that all they owed him on the Fleet note was $60,000. Our review of the record fails to disclose sufficient credible evidence on which to find a meeting of the minds as to a reduction in principal owed on the Fleet note. We therefore reverse the trial court's decision on that issue.

The plaintiff also challenges the trial court's rulings on his claims of default. With respect to payment of back taxes, the plaintiff argues that the court's ruling is inconsistent with both the terms of the July 2 letter and the instruments securing the Fleet note. The trial court based its finding on the terms of the July 2 letter. Since we have reversed the trial court's ruling on the effect of the July 2 letter, and the trial court did not consider the claim of default under the unmodified Fleet security instruments, we vacate that portion of the trial court's order and remand for reconsideration in light of this opinion. We reach a similar conclusion with respect to fees and costs: since the trial court never made a finding on whether fees and costs are recoverable under the unmodified notes, we vacate and remand that issue for the court's reconsideration.

The trial court held that the defendants' failure to prevent the placement of a tax lien on their property was not an event of default because the February 1993 security agreement secures only personal, not real, property. The plaintiff correctly notes, however, that the trial court failed to consider that the tax liens might constitute a default under the instruments securing the Fleet note. We therefore vacate the court's finding that no default occurred and remand for reconsideration.

■ The defendants urge us to reject the plaintiff's claims of default on the basis of the plaintiff's alleged breaches of fiduciary duty and duties of good faith and fair dealing. We note that the trial court found it unnecessary to address the defendants' claims of breach of duty given the court's ruling on modification. We decline to rule on these claims, as they present factual issues that should be addressed by the trial court in the first instance. *See, e.g., Echo Consulting Services v. North Conway Bank*, 140 N.H. 566, 572-73, 669 A.2d 227, 232 (1995). We therefore remand the defendants' breach of duty claims for further proceedings by the trial court.

■ Finally, the plaintiff argues that the trial court erred in holding that he failed to produce sufficient evidence to prove intentional misrepresentation.

> In order to prove deceit, the plaintiff must prove that the defendant intentionally made material false statements to the plaintiff, which the defendant knew to be false or which he had no knowledge or belief were true, for the purpose of causing, and which does cause, the plaintiff reasonably to rely to his detriment.

*Caledonia, Inc. v. Trainor*, 123 N.H. 116, 124, 459 A.2d 613, 617-18 (1983). As evidence of an intentionally false statement, the plaintiff relies on Donald Percy's deposition and trial testimony that he decided on receipt of the July 2 letter that he would never complete a deal with the plaintiff. The trial court, having heard this testimony, nevertheless found no indication that in July 1993, "the defendants had an affirmative intent to deceive the plaintiff." The court observed that "[w]hile both parties hoped to eventually establish Tek-5, each party had different perceptions as to their intended roles and responsibilities," and concluded that "any perceived misrepresentations resulted not from an intent by the defendants to deceive the plaintiff, but rather from feelings of mutual frustration over the failing negotiations."

The trial judge, as the trier of fact, was "in the best position to evaluate the evidence, measure its persuasiveness and appraise the credibility of witnesses." *Gleason v. Elbthal Realty Trust*, 122 N.H. 411, 414, 445 A.2d 1104, 1105-06 (1982). We therefore give considerable deference to his findings. *See State v. Searles*, 141 N.H. 224, 228, 680 A.2d 612, 615 (1996). As we are unable to say that the trial court's finding is unsupported by the evidence, we affirm this portion of the court's order.

> *Affirmed in part; reversed in part; vacated in part; remanded.*

JOHNSON, J., did not participate in the decision of this case; HORTON, J., did not sit; the others concurred.