Ford Motor v. Meredith Motor          CV-99-456-B     08/24/00

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Ford Motor Company**

    **v.**                                    Civil No. 99-456-B
                                   Opinion No. 2000 DNH 186

**Meredith Motor Company, Inc.**


## MEMORANDUM AND ORDER


Ford Motor Company ("Ford") is attempting to relocate one of its dealers to a facility located in Plymouth, New Hampshire. To accomplish the relocation, Ford removed Plymouth from Meredith Motor Company's ("Meredith") market area and assigned it to a competing dealer. Meredith challenged the proposed relocation in an administrative proceeding commenced pursuant to the New Hampshire Motor Vehicle Franchise Act (the "Act"), N.H. Rev. Stat. Ann. ch. 357-C.

In this action, Ford seeks a declaration that its attempt to move a dealer into what was once a part of Meredith's relevant

market area is not subject to regulation under chapter 357-C because: (1) Ford entered into its original dealer agreement with Meredith before the Act was passed; and (2) the Act does not apply to preexisting dealer agreements. In the alternative, Ford seeks an order declaring that the application of the Act to its agreement with Meredith would violate both the Constitution's Contract Clause and the Fourteenth Amendment's Due Process Clause. The parties have filed cross motions for summary judgment.

## I.  BACKGROUND

### A.  Ford's Relationship With Meredith

Ford and Meredith executed a Sales and Service Agreement on June 1, 1972, that was to last for an indefinite period. The agreement contains the following provision concerning Ford's authority to alter Meredith's relevant market area:[1]

---

[1]    The agreement refers to Meredith's relevant market area as Meredith's "dealer locality." See Pl. Ford Motor. Co.'s Mot. for Summ. J. (doc. no. 13) [hereinafter Ford's Mot. for Summ. J.] Ex. A ¶ 1(j) (defining dealer locality as "the locality

The Company reserves the right to determine, from time to time, in its best judgment, the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for COMPANY PRODUCTS within and without the DEALER'S LOCALITY. In making such determinations, the Company from time to time conducts, to the extent deemed adequate by the Company and subject to the ready availability of information, studies of the locality, including such factors as its geographic characteristics, consumer shopping habits, competitive representation patterns, sales and service requirements, convenience of customers or potential customers and past and future growth and other trends in marketing conditions, population, income, UIO, VEHICLE sales and registrations and COMPETITIVE and INDUSTRY CAR and TRUCK registrations.

Pl. Ford Motor Co.'s Mot. for Summ. J. (doc. no. 13) [hereinafter Ford's Mot. for Summ. J.] Ex. A ¶ 9(a).

The agreement also purports to give Ford substantial discretion to add new dealerships and to relocate existing dealerships within Meredith's relevant market area. In

---

designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and service responsibility for COMPANY PRODUCTS"). To be consistent with the statutory terminology, I use the term "relevant market area" rather than "dealer locality." See Compl. (doc. no. 1) ¶ 25 ("The Dealer Locality defined in the Agreement . . . corresponds to the phrase 'relevant market area' as that term is defined under the Act.").

particular, the agreement provides:

> The Company shall have the right to appoint additional dealers in VEHICLES within or without the DEALER'S LOCALITY except that, if an additional dealer will be within the DEALER'S LOCALITY and within ten (10) miles driving distance of the Dealer's principal place of business, the Company shall not appoint the additional dealer unless a study made pursuant to subparagraph 9(a) reasonably demonstrates, in the Company's opinion, that such appointment is necessary to provide VEHICLES with proper sales and service representation in such locality with due regard to the factors referred to above in subparagraph 9(a).

Id. Ex. A. ¶ 9(c).

The parties mutually agreed to add an indemnification provision to the Sales and Service Agreement in 1978. Two new paragraphs were added to the agreement that outlined the parties' respective indemnification obligations in the event of law suits brought by third parties. Ford agreed, with certain exclusions, to indemnify Meredith for liability arising from (1) undiscoverable production defects; (2) design defects; (3) repair of any damage incurred in transit from the manufacturer to the dealer of which Ford did not give the dealer notice; and (4) negligent or improper acts by a Ford employee. See Aff. of Peter

-4-

A. French Ex. 3. In turn, Meredith agreed to indemnify Ford against liability arising from (1) the dealer's failure to comply with any obligation assumed by the dealer pursuant to the agreement; (2) the dealer's negligent or improper preparation, repair, or service; (3) the dealer's breach of any contract between it and its customer; and (4) the dealer's misleading statements, misrepresentations, or deceptive or unfair trade practices with respect to a dealer customer. See id.

In 1996, Fuller Ford asked Ford for permission to relocate its dealership from Bristol, New Hampshire to New Hampton, New Hampshire. Meredith, along with two other dealers, sought declaratory and injunctive relief in state court to prevent Fuller's relocation until Ford gave it proper notice of the proposal. Ford ultimately rejected Fuller's request but began to discuss with Fuller a possible move to Plymouth, New Hampshire.

On December 15, 1997, Ford notified Meredith that it was redefining Meredith's relevant market area to exclude Plymouth. On February 12, 1998, Ford, "[a]s a courtesy," informed Meredith

that Fuller was relocating to Plymouth as of February 28, 1998.

On February 25, 1998, Meredith invoked chapter 357-C and challenged Ford's decision to relocate Fuller to Plymouth by filing a protest with the state's Motor Vehicle Industry Board. Later that spring, Meredith amended its protest to include a challenge to Ford's redefinition of its relevant market area. The Board held several pre-hearing conferences and eventually conducted a full hearing on Meredith's protest in late 1999.  On August 16, 2000, the Board issued a decision upholding Meredith's challenge. The Board determined that Ford had failed to demonstrate "good cause for relocating another dealer in Plymouth, a community that remains part of Meredith Motor's relevant market area."  In the Matter of Meredith Motors, Inc., Docket No. 0060 at 26 (Aug. 16, 2000).

B.  **The Motor Vehicle Franchise Act**

The New Hampshire legislature first adopted a Motor Vehicle Franchise Act in 1973.  The Act was codified as chapter 357-B. See 1973 N.H. Laws 330:2 (repealed 1981).  Chapter 357-B covered

specific types of written or oral agreements between a manufacturer and a dealer and provided that "[a]ny contract or part thereof" that violated the provisions of chapter 357-B was deemed to be "against public policy . . . and void and unenforceable." RSA 357-B:13, 1973 N.H. Laws 330:1 (repealed 1981). It also permitted a dealer injured as a result of a violation of the Act to seek injunctive relief and to recover damages flowing from the violation. See RSA 357-B:3 II, 1973 N.H. Laws 330:1 (repealed 1981); RSA 357-B:12, 1973 N.H. Laws 330:1 (repealed 1981).

Chapter 357-B did not expressly give a dealer the right to challenge a manufacturer's redefinition of its relevant market area. It did, however, prohibit a manufacturer from engaging in "any action which is arbitrary, in bad faith, or unconscionable and which causes damages to any of said parties or to the public." RSA 357-B:4 I, 1973 N.H. Laws 330:1 (repealed 1981). In addition, it imposed restrictions on a manufacturer's ability to grant "a competitive franchise in the relevant market area

previously granted to another franchise." RSA 357-B:4 III(1), 1973 N.H. Laws 330:1 (repealed 1981). A manufacturer seeking to grant such a franchise was required to notify an affected dealer of its intention. If the manufacturer and the affected dealer could not reach an agreement, they were required to submit the matter to "final and binding arbitration under the principles herein prescribed, for a determination of the relevant market area, the adequacy of the servicing of the area by the existing dealer or dealers and the propriety of the granting of such additional dealership." Id.

The New Hampshire legislature repealed chapter 357-B in 1981 and replaced it with N.H. Rev. Stat. Ann. ch. 357-C. See 1981 N.H. Laws 477:2, 477:3. In its current form, chapter 357-C provides for a Motor Vehicle Industry Board to enforce the chapter's provisions. See N.H. Rev. Stat. Ann. § 357-C:12 (Supp. 1999). The current statute expressly requires that a manufacturer must have "good cause" to alter a dealer's relevant market area. See id. § 357:C-3 III(o). It defines good cause in

this context to "include, but not be limited to, changes in the dealer's registration pattern, demographics, customer convenience, and geographic barriers." Id. The statute also requires a manufacturer to notify a dealer of any proposal to add or relocate a competing dealership within the dealer's relevant market area. See id. § 357-C:9 I. The affected dealer may then challenge the proposed addition or relocation by filing a protest with the Board. See id. If a protest is filed, the addition or relocation will not be permitted unless the manufacturer demonstrates that "good cause exists" to justify the additional dealership. See id. § 357-C:9 III. Chapter 357-C:9 further provides that:

> In determining whether good cause has been established for [] entering into or relocating an additional franchise for the same line make, the board shall consider the existing circumstances, including but not limited to:
>     (a)   The permanency of the investment;
>     (b)   Any effect on the retail new motor vehicle business and the consuming public in the relevant market area;
>     (c)   Whether it is injurious or beneficial to the public welfare for an additional new motor vehicle dealership to be established;

(d)  Whether the new motor vehicle dealers of the same line make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of motor vehicle parts, and qualified service personnel;

(e)  Whether the establishment of an additional new motor vehicle dealership would increase competition, and therefore be in the public interest; and

(f)  Growth or decline in population and new car registration in the relevant market area.

Id. § 357-C:9 II.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if the record, viewed in the light most favorable to the non-moving party, shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  See Fed R. Civ. P. 56(c); Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047, 1050 (1st Cir. 1993).  A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

-10-

genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record]. . . which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249). I apply this standard in ruling on the cross-motions for summary judgment.

## III.  ANALYSIS

Ford has filed a three-count complaint.  In Count I, it seeks a declaration that chapter 357-C does not affect its ability to alter Meredith's relevant market area or relocate a competing dealership to Plymouth because its agreement with Meredith predates the adoption of chapter 357-C and the statute applies only to agreements that post-date its enactment.  In Count II, Ford argues that the retrospective application of chapter 357-C to its agreement with Meredith would violate Ford's rights under the Constitution's Contract Clause.  Finally, Ford claims in Count III that any attempt to apply chapter 357-C to its agreement with Meredith would violate its right to due process by impairing its preexisting contract rights.  I address each claim in turn.

## A.    Count I: Statutory Claim

Count I presents a straight-forward question of statutory interpretation: does chapter 357-C apply to contracts that were

formed before the current version of chapter 357-C was enacted?[2] I conclude that it does.

A court must analyze a question of statutory interpretation by first examining "the language of the statute itself." Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 653 (1st Cir. 1997); see also New Hampshire Hemp Council, Inc. v. Marshall, 203 F.3d 1, 6 (1st Cir. 2000); In re Bajgar, 104 F.3d 495, 497 (1st Cir. 1997). The court should give the words in the statute their ordinary meanings and should assume that, "so read," they "accurately express the legislature's intent." Inmates of Suffolk Count Jail, 129 F.3d at 654; In re Bajgar, 104 F.3d at 497; Santana v. Deluxe Corp., 12 F. Supp.2d 162, 168 (D. Mass. 1998). "[U]nless there is a sound reason for departure," a

---

[2] Meredith also argues that chapter 357-C applies here even if the Act does not cover preexisting dealer agreements because the parties materially modified the 1972 Sales and Service Agreement, thereby creating a new contract, after the New Hampshire legislature enacted chapter 357-C. I need not address this argument because I agree with Meredith that the New Hampshire legislature intended to apply chapter 357-C to all dealer contracts, regardless of when the contract at issue was formed.

statute's language also should be "the ending point." <u>New Hampshire Hemp Council, Inc.</u>, 203 F.3d at 6. Legislative history and other aids of statutory construction need be consulted only "'when the literal words of the statute create ambiguity or lead to an unreasonable result.'" <u>Inmates of Suffolk County Jail</u>, 129 F.3d at 654 (quoting <u>United States v. Charles George Trucking Co.</u>, 823 F.2d 685, 688 (1st Cir. 1987)).

I begin my analysis with the text of chapter 357-C. The Act provides in the first paragraph of section 6 that

> [a]ll written or oral agreements of any type between a manufacturer or distributor and a motor vehicle dealer shall be subject to the provision of this chapter . . . .

N.H. Rev. Stat. Ann. § 357-C:6 I (Supp. 1999). This language is a clear and unqualified statement of legislative intention to subject both new and existing dealer agreements to the Act's general regulatory requirements. Any lingering doubts as to the legislature's intention in this regard are dispelled by the section's next paragraph, in which the legislature elected to apply the Act's registration requirements only to "new"

agreements and amendments to existing agreements. <u>See</u> <u>id.</u> § 357-C:6 II. If the legislature intended to similarly limit the Act's other requirements, it is reasonable to assume that it would have used similar limiting language in the first paragraph of section 6.

Despite the plain language of 357-C:3 I, Ford invokes the maxim that statutes are presumed to apply only prospectively. <u>See</u> <u>Hughes Aircraft Co. v. United States</u>, 520 U.S. 939, 946 (1997). This principal of statutory construction ordinarily applies unless there is clear evidence of a legislative intention to give a statute retroactive effect. <u>See</u> <u>Mattis v. Reno</u>, 212 F.3d 31, 36 (1st Cir. 2000).

While I recognize that the presumption against applying statutes retrospectively may be a useful device for resolving legislative ambiguity, I need not - indeed cannot - invoke the presumption in the present case because the legislature has made plain its intention to apply chapter 357-C to dealer contracts that were in existence when the statute was passed. If I were to

adopt Ford's reasoning, it would create two distinct classes of dealers, one which would be subject to state regulation and one which would not. Ford has failed to identify any language in chapter 357-C that support such a result. Accordingly, I reject Ford's argument that chapter 357-C is inapplicable to contracts that were formed before the statute was enacted.

**B.   Count II: Contract Clause Claim**

Ford next argues that the application of chapter 357-C to its agreement with Meredith would violate the Constitution's Contract Clause because the agreement was formed before chapter 357-C was enacted.[3]

**1.   The Law of the Contract Clause: Substantial Impairment**

The Contract Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S.

_____

[3]   Ford also brings an impairment of contract claim under the New Hampshire constitution. I need not separately analyze its state contract clause claim because the New Hampshire Supreme Court has held that the federal and state contract clauses "offer equivalent protections where a law impairs a contract." Opinion of the Justice (Furlough), 135 N.H. 625, 630, 609 A.2d 1204, 1207 (1992).

-16-

Const. art. 1 § 10.  The Contract Clause addresses concerns about retroactive or retrospective legislation.  Parella v. Retirement Bd. of the Rhode Island Employees' Retirement Sys., 173 F.3d 46, 59 (1st Cir. 1999) (noting that "original intent" of Contract Clause "was to bar retroactive laws").  Although absolute on its face, the Contract Clause is not interpreted or applied literally.  See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240 (1978); Chrysler Corp v. Kolosso Auto Sales, Inc., 148 F.3d 892, 894 (7th Cir. 1998), cert. denied, 525 U.S. 1177 (1999); Parker v. Wakelin, 123 F.3d 1, 4 (1st Cir. 1997).  Rather, the Supreme Court recognizes that it must be "accommodated to the inherent police power of the State to safeguard the vital interests of its people."  Energy Reserve Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 410 (1983) (internal quotation marks and citation omitted).

The threshold question in addressing a Contract Clause claim is whether the law in question substantially impairs a contractual relationship.  See id. at 411; Allied Structural

Steel Co., 438 U.S. at 244; Mercado-Boneta v. Administracion Del Fondo De Compensacion Al Paciente, 125 F.3d 9, 12 (1st Cir. 1997). This question has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (finding no contract); see also Mercado-Boneta, 125 F.3d at 13; Parker, 123 F.3d at 5. Resolution of the third component, substantial impairment, depends upon the parties' expectations when they entered their contract. See Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 190 (1st Cir. 1999). Also of "great," if not "controlling," importance in evaluating a substantial impairment claim is the "foreseeability of the law when the original contract was made." Kolosso Auto Sales, Inc., 148 F.3d at 894. Both the parties' expectations and the foreseeability of the law turn in part on whether "the industry the complaining party has entered has been regulated in the past." Energy Reserve Group, Inc., 459 U.S. at 411; Houlton

Citizens' Coalition, 175 F.3d at 190; Kolosso Auto Sales, Inc., 148 F.3d at 895 (noting that past regulation of some aspects of commercial activity does not "put the regulated firm on notice that an entirely different scheme of regulation will be imposed").

## 2. Application

Ford's Contract Clause claim ultimately fails because it rests on a faulty premise, namely that the parties' original 1972 agreement was never significantly amended so as to bring it within the reach of chapter 357-C. As I discuss below, the parties agreed in 1978 to modify the contract by adding an indemnification provision that materially modified their prior contractual relationship. This modification gave rise to a new contract that was subject to the then-existing version of the Motor Vehicle Franchise Act, chapter 357-B. Accordingly, Ford's argument that it entered into an agreement with Meredith with no expectation that the parties' relationship would be subject to state regulation lacks merit. While I do not doubt that the

current version of chapter 357-C imposes real changes in the law that affect Ford's relationship with Meredith, they are not "major change[s]" that amount to a substantial impairment of Ford's contract rights. Accordingly, Ford cannot establish a violation of the Contract Clause. See Kolosso Auto Sales, Inc., 148 F.3d at 896.

### a. The 1978 Contract Amendment

The parties do not dispute that they originally entered into the Sales and Service Agreement in 1972. They disagree, however, as to whether the modification of the Sales and Service Agreement in 1978 to include the indemnification provision resulted in a new contract between them. Meredith claims that this provision gave rise to a new contract because it materially altered the parties' contractual relationship.[4] Ford responds that the

---

[4] Meredith has identified several additional modifications to the parties's original 1972 agreement: (1) sales and customer service bulletins Ford periodically issued to dealers; (2) the restructuring of the net working capital requirements that Ford imposed on dealers; (3) the change in Ford's warranty service policy; and (4) the transfer of an ownership interest to Peter French. Because I determine that Meredith is entitled to prevail based on the 1978 indemnification

inclusion of the indemnification provision is not the kind of modification that could give rise to a new contract.

New Hampshire law does not provide a clear rule for determining the circumstances under which a contract modification is capable of giving rise to a new agreement between the parties. Rather, with respect to modifications, the only requirement imposed by New Hampshire law is that the parties mutually agree to the modification.[5]  See Walker v. Percy, 142 N.H. 345, 349,

_____

provision, I need not determine whether any of the other modifications also resulted in the formation of new contracts.

[5]  The parties' agreement provides that it is to be "construed in accordance with the laws of the State of Michigan." Ford's Mot. for Summ. J. Ex. A ¶ 32.  New Hampshire honors choice of law provisions so long as "the contract bears any significant relationship to" the chosen jurisdiction.  Allied Adjustment Serv. v. Heney, 125 N.H. 698, 700, 484 A.2d 1189, 1191 (1984); see also Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1467 (1st Cir. 1992); Kentucky Fried Chicken Corp. v. Collectramatic, Inc., 130 N.H. 680, 684, 547 A.2d 245, 247.  I need not decide whether to enforce the contract's choice of law clause, however, because neither party argues for the application of Michigan law and, in any event, the relevant law of both states appears to be consistent.  See Hy King Assocs., Inc. v. Versatech Mfg. Indus., Inc., 826 F. Supp. 231, 240 (E.D. Mich. 1993); Stephen Sloan Realty Co. v. 555 South Woodward Assocs., 601 F. Supp. 1008, 1011 (E.D. Mich. 1985).

-21-

702 A.2d 313, 316 (1997); <u>Guaraldi v. Trans-Lease Group</u>, 136 N.H. 457, 460-61, 617 A.2d 648, 650 (1992).  As a result, I look to decisions from other jurisdictions for guidance when determining whether Ford and Meredith's original 1972 agreement has been amended in such a way as to give rise to a new agreement between them.

Not every contract modification gives rise to a new contract.  See <u>Bitronics Sales Co. v. Microsemiconductor Corp.</u>, 610 F. Supp. 550, 557 (D. Minn. 1985); <u>In re Kerry Ford, Inc.</u>, 666 N.E.2d 1157, 1162 (Ohio Ct. App. 1995).  Rather, a new contract is not formed unless there is a "significant or material alteration of the relationship between the parities."  <u>Bitronics Sales Co.</u>, 610 F. Supp. at 557; <u>see also</u> <u>McKay Nissan, Ltd. v. Nissan Motor Corp.</u>, 764 F. Supp. 1318, 1319 (N.D. Ill. 1991); <u>In re Kerry Ford, Inc.</u>, 666 N.E.2d at 1162.  Such a significant modification indicates that the parties made a "fresh decision" about their contractual relationship.  See <u>Bitronics Sales Co.</u>, 610 F. Supp. at 557; <u>Rochester v. Royal Appliance Mfg. Co.</u>, 569

F. Supp. 736, 739 (W.D. Wis. 1983).

Using this test, I determine that the parties' 1978 modification of the Sales and Service Agreement to include a reciprocal indemnification provision materially altered the parties' rights and obligations, thereby creating a new agreement between them. In addition to being the product of mutual agreement, the modification was supported by adequate consideration: the parties exchanged promises to indemnify each other, an obligation neither previously had under the agreement. The potential liability associated with each party's agreement to indemnify the other against third party law suits was a material alteration of the parties' rights and obligations. As a result, it amounted to more than a minor change in the administrative details of the parties' relationship. The indemnification provision was an important expression of what the parties recognized as their "interdependence" in achieving the goal of building and maintaining a broad base of satisfied customers. See Ford's Mot. for Summ. J. Ex. A at i. Accordingly, I

determine that the contract on which Ford bases its Contract Clause claim was formed no earlier than 1978, when the parties agreed to incorporate the indemnification provision.

b. <u>Significant Impairment Analysis</u>

Having determined that the parties entered into the current version of the Sales and Services Agreement no earlier than 1978, I next consider whether Ford's rights under the 1978 agreement would be substantially impaired if it is required to conform to the current version of chapter 357-C.

New Hampshire had a well-established history of regulating the relationship between manufacturers and dealers by 1978, when the current version of the Sales and Service Agreement went into effect. Although the New Hampshire legislature did not expressly impose a "good cause" requirement on a manufacturer's attempt to alter a dealer's relevant market area until it enacted chapter 357-C, it did specify in chapter 357-B that manufacturers were barred from taking any "arbitrary, [] bad faith, or unconscionable" actions against dealers. <u>See</u> RSA 357-B:4 I, 1973

N.H. Laws 330:1 (repealed 1981). Further, while the legislature did not create the Motor Vehicle Industry Board and expressly impose a "good cause" requirement on dealer relocation decisions until it replaced chapter 357-B with chapter 357-C, it did give affected dealers a right in chapter 357-B to challenge proposed dealer relocations through binding arbitration. Finally, although chapter 357-B does not contain chapter 357-C's provision for an automatic stay, see N.H. Rev. Stat. Ann. § 357-C:9 I, chapter 357-B functioned in essentially the same way because it required a manufacturer to notify a dealer of a proposed relocation and specified that any dispute concerning the proposed relocation would have to be resolved through binding arbitration. See RSA 357-B:4 III(l), 1973 N.H. Laws 330:1 (repealed 1981).

While the above-described differences between chapter 357-B and chapter 357-C represent refinements in the law as it existed when Ford and Meredith entered into the 1978 Sales and Service Agreement, these changes all are "in the direct path of the plausible (though of course not inevitable) evolution of [New

-25-

Hampshire's] program for regulating automobile dealership contracts . . . and constituted only . . . small and predictable step[s] along that path." See Kolosso Auto Sales, Inc., 148 F.3d at 896. Accordingly, they do not result in the kind of significant impairments that are necessary to support a Contract Clause claim.

## C.  Count III: Due Process Claim

Although not clearly articulated, the premise of Ford's due process claim is similar to that of its Contract Clause claim: the retroactive application of chapter 357-C to Ford's agreement with Meredith violates Ford's rights to due process of law because it would upset Ford's contract rights and expectations without sufficient justification. I reject this argument as well.

A state legislature is entitled to deference when enacting retrospective legislation so long as "the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means." Pension Benefit Guaranty Corp. v.

R.A. Gray & Co., 467 U.S. 717, 729 (1984); see also Holland v. Keenan Trucking Co., 102 F.3d 736, 740 (4th Cir. 1996). To satisfy this test of due process, the party defending the statute must demonstrate that "the retroactive application of the legislation is itself justified by a rational legislative purpose." Pension Benefit Guaranty Corp., 467 U.S. at 730; see also Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255 (D.C. Cir. 1998); Liberty State Bank v. Minnesota Life and Health Ins. Guar. Ass'n, 149 F.3d 832, 834 (8th Cir. 1998); Honeywell, Inc. v. Minnesota Life and Health Ins. Guar. Ass'n, 110 F.3d 547, 555 (8th Cir. 1997). The standard that governs due process challenges to retrospective legislation is less exacting, however, than the test used in evaluating claims under the Contract Clause. See Pension Benefit Guaranty Corp, 467 U.S. at 733 ("[W]e have contrasted the limitations imposed on States by the Contract Clause with the less searching standards imposed on economic legislation by the Due Process Clause."); Mercado-Boneta, 125 F.3d at 13; Liberty Mut. Ins. Co. v.

<u>Whitehouse</u>, 868 F. Supp. 425, 434 (D.R.I. 1994) (noting that the "standards applicable to economic legislation under the Due Process Clause are less exacting than the limitations imposed on states by the Contract Clause").

Chapter 357-C survives Ford's due process challenge because the legislature had a rational basis for concluding that the Act serves the state's legitimate interest in protecting dealers from the superior and potentially oppressive power of manufacturers. See <u>New Motor Vehicle Bd. v. Orrin W. Fox, Inc.</u>, 439 U.S. 96, 100-01 (1978) (observing that the federal and state governments had enacted dealer protection statutes because of the "disparity in bargaining power" between dealers and manufacturers); <u>Beard Motors, Inc. v. Toyota Motor Distribs., Inc.</u>, 480 N.E.2d 303, 306 (Mass. 1985) (noting the potentially oppressive power of manufacturers). Imposing reasonable limitations on a manufacturer's ability to take arbitrary action against a dealer – for example, permitting a manufacturer to redefine a dealer's relevant market area only for good cause – is rationally related

to that purpose.  Further, a dealer's need for protection from exploitation at the hands of a manufacturer is not lessened simply because the dealer may have entered into an agreement with the manufacturer before the Act was passed.  Accordingly, I reject Ford's due process challenge.

## IV.  CONCLUSION

For the foregoing reasons, I deny Ford's motion for summary judgment (doc. no. 13) and grant Meredith's cross-motion for summary judgment (doc. no. 18).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

August 24, 2000

cc:  James Higgins, Esq.
     Nicholas Christakos, Esq.
     Gregory A. Holmes, Esq.